# Authorization for the Release of Information/ Privacy Act Notice

to the U.S. Department of Housing and Urban Development (HUD) and the Housing Agency/Authority (HA)

**U.S. Department of Housing and Urban Development**
Office of Public and Indian Housing

OMB CONTROL NUMBER: 2501-0014
exp. 1/31/2014

| PHA requesting release of information; (Cross out space if none) (Full address, name of contact person, and date) | HA requesting release of information: (Cross out space if none) (Full address, name of contact person, and date) |
|---|---|
| Central Virginia Housing Coalition<br>208 Hudgins Road<br>Fredericksburg, VA 22408 | ✗ |

**Authority:** Section 904 of the Stewart B. McKinney Homeless Assistance Amendments Act of 1988, as amended by Section 903 of the Housing and Community Development Act of 1992 and Section 3003 of the Omnibus Budget Reconciliation Act of 1993. This law is found at 42 U.S.C. 3544.

This law requires that you sign a consent form authorizing: (1) HUD and the Housing Agency/Authority (HA) to request verification of salary and wages from current or previous employers; (2) HUD and the HA to request wage and unemployment compensation claim information from the state agency responsible for keeping that information; (3) HUD to request certain tax return information from the U.S. Social Security Administration and the U.S. Internal Revenue Service. The law also requires independent verification of income information. Therefore, HUD or the HA may request information from financial institutions to verify your eligibility and level of benefits.

**Purpose:** In signing this consent form, you are authorizing HUD and the above-named HA to request income information from the sources listed on the form. HUD and the HA need this information to verify your household's income, in order to ensure that you are eligible for assisted housing benefits and that these benefits are set at the correct level. HUD and the HA may participate in computer matching programs with these sources in order to verify your eligibility and level of benefits.

**Uses of Information to be Obtained:** HUD is required to protect the income information it obtains in accordance with the Privacy Act of 1974, 5 U.S.C. 552a. HUD may disclose information (other than tax return information) for certain routine uses, such as to other government agencies for law enforcement purposes, to Federal agencies for employment suitability purposes and to HAs for the purpose of determining housing assistance. The HA is also required to protect the income information it obtains in accordance with any applicable State privacy law. HUD and HA employees may be subject to penalties for unauthorized disclosures or improper uses of the income information that is obtained based on the consent form. Private owners may not request or receive information authorized by this form.

**Who Must Sign the Consent Form:** Each member of your household who is 18 years of age or older must sign the consent form. Additional signatures must be obtained from new adult members joining the household or whenever members of the household become 18 years of age.

Persons who apply for or receive assistance under the following programs are required to sign this consent form:

- PHA-owned rental public housing
- Turnkey III Homeownership Opportunities
- Mutual Help Homeownership Opportunity
- Section 23 and 19(c) leased housing
- Section 23 Housing Assistance Payments
- HA-owned rental Indian housing
- Section 8 Rental Certificate
- Section 8 Rental Voucher
- Section 8 Moderate Rehabilitation

**Failure to Sign Consent Form:** Your failure to sign the consent form may result in the denial of eligibility or termination of assisted housing benefits, or both. Denial of eligibility or termination of benefits is subject to the HA's grievance procedures and Section 8 informal hearing procedures.

**Sources of Information To Be Obtained**

State Wage Information Collection Agencies. (This consent is limited to wages and unemployment compensation I have received during period(s) within the last 5 years when I have received assisted housing benefits.)

U.S. Social Security Administration (HUD only) (This consent is limited to the wage and self employment information and payments of retirement income as referenced at Section 6103(l)(7)(A) of the Internal Revenue Code.)

U.S. Internal Revenue Service (HUD only) (This consent is limited to unearned income [i.e., interest and dividends].)

Information may also be obtained directly from: (a) current and former employers concerning salary and wages and (b) financial institutions concerning unearned income (i.e., interest and dividends). I understand that income information obtained from these sources will be used to verify information that I provide in determining eligibility for assisted housing programs and the level of benefits. Therefore, this consent form only authorizes release directly from employers and financial institutions of information regarding any period(s) within the last 5 years when I have received assisted housing benefits.

---

Original is retained by the requesting organization.     ref. Handbooks 7420.7, 7420.8, & 7465.1     form HUD-9886 (7/94)

# Family Obligations Notice
## VHDA Housing Choice Voucher Program

In order to participate in the Housing Choice Voucher (HCV) Program, you and all members of your family must agree to follow the rules listed below. All family members age 18 and older must sign this document upon admission to the HCV Program and at each annual reexamination to acknowledge all family members have read and understand the rules outlined in this notice.

1. The family must supply any information that HUD, VHDA or the local housing agency determines is necessary in the administration of the program, including submission of required evidence of citizenship or immigration status.

2. The family must supply any information requested by HUD, VHDA or the local housing agency for use in a regularly scheduled examination or interim reexamination of family income and composition.

3. The family must disclose and verify social security numbers and sign and submit consent forms for obtaining this information.

4. Any information supplied by the family must be true and complete.

5. The family is responsible for correcting any HQS violations caused by the family such as failing to pay tenant-provided utilities, failing to provide and maintain any tenant-provided appliances, or having a household member or guest cause damage to the unit or premises beyond normal wear and tear.

6. The family must allow the local housing agency or VHDA to inspect the unit at reasonable times after reasonable notice.

7. The family must not commit any serious or repeated violation of the lease. Any incidents of, or criminal activity related to, domestic violence, dating violence, sexual assault, or stalking will not be construed as serious and repeated lease violations by the victim.

8. The family must notify the local housing agency and the owner before moving out of the unit or terminating the lease.

9. The family must promptly provide the local housing agency a copy of any owner eviction notice.

10. The family must use the assisted unit as their sole residence.

11. The composition of the family residing in the unit must be approved by the local housing agency.

12. The family must promptly inform the local housing agency in writing of the birth, adoption or court-awarded custody of a child.

13. The family must request approval in writing from the local housing agency to add another family member as an occupant of the unit.

14. The family must promptly notify the local housing agency in writing if any family member no longer resides in the unit.

15. If the local housing agency has given approval, a foster child, foster adult or a live-in aide may reside in the unit.

16. Members of the household may engage in legal profit-making activities in the unit, but only if such activities are incidental to the primary use of the unit for residence by the family.

17. The family must not sublease the unit.

18. The family must not assign the lease or transfer the unit.

19. The family must supply any information requested by the local housing agency to verify that the family is living in the unit or relating to family absence from the unit.

20. The family must promptly notify the local housing agency in writing of absence from the unit.

Previous editions are obsolete                                          VHDA FON-1 (Rev 10/14)

# ELNORA DELCID v. HAMPTON NOBLE LP AND S.L. NUSBAUM REALTY CO.

**REB FILE NUMBER: 2020-02605**
**HUD FILE NUMBER: 03-20-6320-8**

## CASE ANALYSIS

**I.  SUMMARY OF COMPLAINANT'S ALLEGATIONS:**

Complainant alleges the Respondents otherwise denied or made housing unavailable to her on the basis of her race (Black) and refused to make a reasonable accommodation on the basis of disability.

Complainant alleges that on or about August 6, 2019, she applied to rent unit 103 in building 1181 of the subject property. Complainant alleges that she was approved to rent the unit and was repeatedly advised that the unit was available; however, when she arrived to sign the lease for the unit, she was advised that unit 103 was rented. Complainant alleges she was instead placed in unit 204. Complainant alleges unit 103, her desired unit, was rented to a white tenant. Complainant alleges that by renting the unit to white tenant after approving her to rent the unit, the Respondents otherwise made housing unavailable to her on the basis of her race.

Complainant alleges that in or about May 2020, she informed the Respondents that she was continuing to have an issue with odors permeating from a neighbor's unit and a black substance appearing in her window. Complainant alleges she informed the Respondents that she has cleaned the black substance repeatedly but it continues to reappear. Complainant alleges she informed the Respondents that the substance and odors are negatively affecting symptoms of her disability and requested they allow her to transfer units. Complainant alleges the Respondents denied her request and has not taken any other action to mitigate the situation. **(Tab II.A-1)**

**II.  SUMMARY OF RESPONDENTS' DEFENSES:**

James Wood, attorney for the respondents, provided the following written response to the complaint as well as the exhibits as noted throughout her response. Below in relevant part is the response verbatim including any spelling or grammatical errors:

    I.
        FACTUAL BACKGROUND

As described in more detail below, there is absolutely no merit to either of the Complainant's allegations that she was denied housing on the basis of her race (or for any other unlawful reason) or was denied a reasonable accommodation. First, Ms. Delcid alleges that she sought to rent Unit 103 in Building 1181 in or around August 2019; however, Unit 103 in Building 1181 was continuously leased dating back to August 25, 2017. Moreover, there is no record that corroborates or supports Ms. Delcid's claim that she applied for Unit 103 in Building 1181, again, because it was leased well before Ms. Delcid moved to the property.

Moreover, Ms. Delcid alleges that she requested a reasonable accommodation to transfer units due to an alleged odor permeating from her neighbor's unit and a black substance allegedly appearing on her window. In May 2020, Ms. Delcid did indeed complain about a smell of "dead bodies sitting in a coffin for three days" or dog which she falsely claimed was due to the ten dogs kept by her upstairs neighbor. Upon investigation, however, there was no smell (nor did her neighbor have ten dogs or any dead bodies). Importantly though, despite her complaints about the smell, Ms. Delcid never mentioned any alleged disability and never requested a reasonable accommodation based on any alleged disability.

For these reasons, as described more fully below, we respectfully request that a no cause determination be issued in response to this matter.

### A. Background on the Property and Its Staff during the Relevant Period

The Valor Apartment Homes ("Valor") is an apartment community located in Fredericksburg, Virginia owned by Respondent Hamptons at Noble LP and managed by Respondents SLN. While there has been staff turnover since August 2019, Ms. Finnessa Randall (African American) has served as a Leasing Consultant with Valor throughout Ms. Delcid's residency. Notably, Ms. Randall also served as the Leasing Consultant who primarily assisted Ms. Delcid in 2019.

In addition to Ms. Randall, Ms. Marie White has worked at Valor since August 2019. Initially, she served as Assistant



Community Manager from August 2019 through February 2020. Since February 2020, Ms. White has served as Community Manager. Ms. Juana Lozano has served as Assistant Community Manager since February 2020 and Mr. Gabriel Fernandez has served as Leasing Consultant since September 2019.

### B. Ms. Delcid Leases Unit 204 in Building 1181

In late July 2019, Ms. Delcid first registered her interest in a unit at Valor or Valor West (a sister property across the street that is also managed by SLN and the team that manages Valor). Ms. Delcid explained that she would be utilizing a housing choice voucher in order to lease a unit at either Valor or Valor West. As she met the basic qualifications for tenancy, provided she would receive the appropriate housing choice voucher amount, the Respondents worked with Ms. Delcid to complete the Request for Tenancy Approval ("RFTA") <u>on July 30, 2019 for Unit 102 in Building 1773.</u> On the same day, the Respondents emailed the completed RFTA to Ms. Delcid's Public Housing Agency, Central Virginia Housing Coalition ("CVHC"). Please find a copy of the completed RFTA attached as Exhibit A.

Shortly after sending the completed RFTA to CVHC, Ms. Margie Himes, a Housing Choice Voucher Program Housing Agent with CVHC, responded on July 30, 2019 and asked whether the Respondents would consider lowering the rent amount in order for Ms. Delcid to qualify. While the Respondents were unable to lower the rent amount, they did indicate that there would be other units available in August that would meet the voucher limits, including a larger two bedroom unit than the one Ms. Delcid initially sought. Please find copies of the correspondence between CVHC and the Respondents attached as Exhibit B.

Upon CVHC discussing the situation with Ms. Delcid, an updated RFTA was submitted on July 31, 2019 for Unit 204 in Building 1181. This was subsequently approved by CVHC and Ms. Delcid signed the lease on August 6, 2019. Please find a copy of the updated RFTA attached as Exhibit C and a copy of Ms. Delcid's original lease attached as Exhibit D.

Unfortunately, Ms. Delcid was not qualified to lease Unit

102 in Building 1773 as the housing choice voucher was not approved for that unit. Moreover, Ms. Delcid was aware of this situation and did not express any reservations or hesitation with the larger unit that her voucher was approved for in Building 1181. Furthermore, contrary to Ms. Delcid's allegations, she never once expressed interest or applied to lease Unit 103 in Building 1181. In fact, Unit 103 in Building 1181 had been consistently leased since August 25, 2017. Please find a copy of the 2019 lease for Unit 103 in Building 1181 attached as Exhibit E. As this lease shows, the lease was renewed on July 2, 2019 almost a month before the initial RFTA was completed for Ms. Delcid.

Ultimately, Ms. Delcid only received approval to lease Unit 204 in Building 1181. She was not approved for any other unit and only sought qualification for one other unit (Unit 102 in Building 1773), but not for Unit 103 in Building 1181. As such, Ms. Delcid's allegation that she was denied housing or that housing was made unavailable to her on the basis of her race is wholly and factually inaccurate.

### C. Ms. Delcid Complains about Smells in her Unit

In her Complaint, Ms. Delcid alleges that in May 2020, she indicated to the Respondents that there was an odor permeating from her neighbor's unit and a black substance that kept re-appearing on her window. Moreover, Ms. Delcid alleges that in or around May 2020, she requested a reasonable accommodation based on the alleged odor impacting her alleged disability. Indeed, in September 2019, Ms. Delcid first raised a concern about a sewer odor that she allegedly smelled in her apartment. Upon inspection though, no odor was smelled or identified by the Valor service team that responded to her unit. As such no action was taken. Importantly, Ms. Delcid did not mention any disability, any need for a reasonable accommodation, or anything more on the smell. Please find the September 2019 Service Request included with all other Service Requests placed by Ms. Delcid attached as Exhibit F.

On May 14, 2020, Ms. Delcid again complained about a smell in her unit. (Please find the corresponding Service Request with Exhibit F.) Ms. White and Ms. Lozano responded to this concern on May 18, 2020 by going to Ms. Delcid's unit to determine whether there was a smell and, if there was a smell, to identify the source of the smell. Upon entering Ms. Delcid's unit, neither Ms. White nor Ms. Lozano smelled anything that

COPY

was out of the ordinary or overwhelming. As they walked around the unit though, they did smell garlic and identified that Ms. Delcid was storing cloves of garlic in her closet. During this meeting with Ms. Delcid, Ms. White and Ms. Lozano explained that they did not smell anything (other than the garlic). Ms. Delcid insisted though that she smelled "dead bodies sitting in a coffin for three days" or dog coming from her neighbor upstairs who she alleged had ten dogs in the unit. Ms. White and Ms. Lozano subsequently verified that the neighbor upstairs was not keeping ten dogs or dead bodies in the unit.

A few days prior to this, on May 11, 2020 Ms. Delcid stopped by the property management office to discuss her lease renewal with Ms. Lozano. During this interaction, Ms. Delcid did not mention any odor issues. Rather, Ms. Delcid expressed that she wanted to transfer to a one bedroom unit, but did not directly or indirectly state or insinuate that such a transfer was due to any disability-related reason. Despite the allegations in Ms. Delcid's Complaint, Ms. Delcid **never** made any request or statements to suggest that she was requesting any form of a reasonable accommodation due to an alleged odor in her unit. Moreover, the Respondents were not aware of any disability or any disability-related need for any reasonable accommodation, including but not limited to transferring units. Please find correspondence related to Ms. Delcid's May 11, 2020 visit attached as Exhibit G.

Ms. Delcid was not only raising unfounded concerns with Respondents. Indeed, the Fredericksburg Police Department notified the Respondents that Ms. Delcid generated 56 unfounded police service calls from July 2019 to July 2020 and that the Police Department would "no longer be responding to any Police calls [made by Ms. Delcid] unless there is a serious allegation being made." The police did mention that these requests could relate to mental concerns with Ms. Delcid, but Ms. Delcid herself never raised a disability with Respondents and never made any accommodation request related to an alleged mental health condition. Please find the correspondence from the Fredericksburg Police Department attached as Exhibit H.

Since filing this Complaint, CVHC reached out to the Respondents to indicate that Ms. Delcid *may* want to transfer units, not due to a disability-related need, but due to disputes with neighbors. Ms. Delcid also called the Respondents on August 4, 2020 to demand that the Respondents forbid residents from

having guests because the guests were spreading COVID-19 and to let the Respondents know that she was allergic to dogs and would obtain verification of this. The Respondents updated CVHC regarding Ms. Delcid's August 4th communication and indicated that they reserved two units for Ms. Delcid should she wish to transfer based on reasonable accommodation (despite the fact that Ms. Delcid still had not actually requested any reasonable accommodations). Ultimately, the CVHC agent indicated that Ms. Delcid was not interested in one of the two available units, but would stop by the leasing office to discuss a potential transfer with the Respondents. Please find the correspondence between CVHC and the Respondents attached as Exhibit I.

The Respondents remain ready to entertain and assist with any transfer request based on a request for a reasonable accommodation or otherwise, but Ms. Delcid has yet to come by the leasing office to discuss this issue. In fact, Ms. Delcid has since renewed her lease for Unit 204 in Building 1181 without requesting to view any other available units or transfer to any other units. Please find Ms. Delcid's new lease dated August 12, 2020 attached as Exhibit J.

On September 17, 2020, Ms. Delcid again complained of an odor in her apartment. This time, she indicated that there was a chemical smell throughout her unit. As such, Mr. Fernandez and the Service Manager both went to Ms. Delcid's apartment to once again identify any odors. While neither Mr. Fernandez nor the Service Manager smelled anything, Ms. Delcid stated that her upstairs neighbor was using chemicals which contributed to the smell in her unit. In addition, Ms. Delcid falsely claimed that another resident alerted the Respondents that they saw Ms. Delcid's upstairs neighbor throw dog urine on Ms. Delcid's balcony. Ms. Delcid alleged that the dog urine dumped on her balcony was contributing to the smell in her unit. However, the Respondents have never been made aware of any incident where Ms. Delcid's upstairs neighbor threw dog urine on her balcony. Please find evidence related to the September 17, 2020 incident attached as Exhibit K.

## II. LEGAL ANALYSIS

The Complainant asserts that the Respondents intentionally discriminated against her because of her race (Black) and her alleged disability. However, the Complainant

*copy*

cannot establish disparate treatment or refusal to make reasonable accommodations under the circumstances alleged.

A.  <u>Otherwise Deny or Make Housing Unavailable</u>

The Fair Housing Act makes it unlawful "[t]o refuse to sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of race, color, religion, sex, familial status, or national origin." 42 U.S.C. § 3604(a). The Virginia Fair Housing Law ("VFHL") similarly states "[i]t shall be an unlawful discriminatory housing practice for any person... to refuse to sell or rent after the making of a bona fide offer or to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of race, color, religion, national origin, sex, elderliness, or familial status." Va. Code§ 36-96.3.A.1. With that said, the analysis of both claims is the same. *de Reyes v. Waples Mobile Home Park Ltd. P'ship,* 251 F. Supp. 3d 1006, 1013 (E.D. Va. 2017) ("Because the FHA and VFHL are essentially similar, the same analysis applies to both disparate treatment claims"); See also *Moseke v. Miller & Smith, Inc.,* 202 F.Supp.2d 492, 495 n.2 (E.D. Va. 2002) (utilizing the same standards to FHA and VFHL claims); *Bradley v. Carydale Enters.,* 707 F. Snpp. 217, 222 (E.D. Va. 1989).

In order to establish a prima facie case for discrimination, the Complainant must establish (1) that she belongs to a protected class; (2) she sought and was qualified for a dwelling; (3) she was denied the opportunity to rent the dwelling; and (4) the dwelling remained available to others outside of the plaintiffs protected class. *See de Reyes v. Waples Mobile Home Park Ltd. P'ship,* 251 F. Supp. 3d 1006, 1014 (E.D. Va. 2017); *Martin v. Brondum,* 535 Fed.Appx. 242, 244 (4th Cir. 2013); *Mitchell v. Shane,* 350 F.3d 39, 47 (2d Cir. 2013) (similar); *Sullivan v. Hernandez,* 215 F. Supp. 2d 635, 638 (D. Md. 2002); *Selden Apartments v. HUD,* 785 F.2d 152, 159 (6th Cir. 1986). Even if Ms. Delcid were able to establish a prima facie case, the Respondents are then given an opportunity to establish that they made rental decisions for legitimate non-discriminatory reasons. Here, Ms. Delcid cannot establish a prima facie case, and Respondents can easily establish they took all actions for legitimate non-discriminatory reasons.

As a threshold matter, Ms. Delcid alleges that she was

REB File Number: 2020-02605
HUD File Number: 03-20-6320-8
Page 7 of 13

denied housing because the Respondents would not lease Unit I 03 in Building 1181 to her. However, as has been established, Unit I 03 in Building 1181 was not available and Ms. Delcid never applied to rent that unit. As such, Ms. Delcid's prima facie case fails because she did not seek to lease Unit 103 in Building 1183 and the unit was simply not available to be leased.

While Ms. Delcid does not allege discrimination related to the RFTA submitted for Unit 102 in Building 1773, had she made such an allegation, again Ms. Delcid's Complaint would fail. With regard to Unit I 02 in Building 1181, it was not the Respondents who denied Ms. Delcid's request, rather CVHC, the Public Housing Agency, did not approve Ms. Delcid's housing choice voucher. As such, Ms. Delcid's prima facie case would again fail because she was not qualified to lease the unit.

Furthermore, Ms. Delcid's claim of racial discrimination is belied by the simple fact that the Respondents did in fact lease a unit to Ms. Delcid. *See de Reyes v. Waples Mobile Home Park Ltd. P'ship,* 251 F. Supp. 3d 1006, 1017 (E.D. Va. 2017) (undisputed facts that defendants had a history of leasing to non-citizens and Latinos "belie[d] any claim of intentional housing discrimination 'because of race or national origin.'"); *Martin v. Long & Foster Real Estate Inc.,* No. l:11-cv-1118, 2012 WL 3991900, at 8* (E.D. Va. Sept. 11, 2012)(granting defendants summary judgment on housing discrimination claim and noting an eight year contractual relationship between lessor and lessee constituted "strong evidence" that the lessor lacked racial animus), *ajf'd sub nom. Martin v. Brondum,* 535 Fed.Appx. 242 (4th Cir. 2013). In addition, as Ms. Randall was the leasing consultant who assisted Ms. Delcid throughout the leasing process, it is further implausible for Ms. Delcid to claim racial discrimination related to this leasing process when Ms. Randall herself is also African American. *See Proud v. Stone,* 945 F.2d 796, 798 (4t1' Cir. 1991).

### B. Refusal to Make Reasonable Accommodation

The Complainant further alleges that Respondents discriminated against her by refusing to provide her with a reasonable accommodation required because of her alleged disability. The Fair Housing Act makes it unlawful "[t]o discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection with such dwelling, because of

COPY

a handicap of ... (A) that person...." 42 U.S.C. § 3604(f)(2)(A). Among other things, "discrimination" within the meaning of that provision includes "a refusal to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling." 42 U.S.C. § 3604(f)(3)(B).

To establish a prima facie claim for failure to accommodate in violation of the FHA, the Complainant must show that "(1) [she] is disabled or handicapped within the meaning of the [Fair Housing Act], (2) [the Complainant] requested a reasonable accommodation, (3) such accommodation was necessary to afford [her] an opportunity to use and enjoy [the] dwelling, and (4) (Respondents) refused to make the requested accommodation." *Hawn v. Shoreline Towers Phsa 1 Condo. Ass'n, inc.,* 347 Fed. Appx. 464,467 (11th Cir. 2009) (citing *Schwartz v. City of Treasure Island,* 544 F.3d 1201, 1218-19 (11th Cir. 2008)).

The Complainant's claim must fail, because she has not demonstrated that she informed Respondents that she was disabled or handicapped and she is unable to show or support any allegation that the Respondents denied her a reasonable accommodation. Indeed, while Ms. Delcid did complain about the smell she alleged was throughout her apartment, she never indicated any sort of disability let alone a disability that was exacerbated by the alleged smell that required a transfer as a reasonable accommodation.

Again, as a threshold matter, the Complainant fails to demonstrate that any request for a reasonable accommodation was ever made. According to the 2004 Joint Statement of The Department of Housing and Urban Development and the Department of Justice on Reasonable Accommodations under the Fair Housing Act, "[a]n applicant or resident is not entitled to receive a reasonable accommodation **unless she requests one."** See Joint Statement at page 10.

Moreover, regardless of the reason for a transfer, upon notification *(after* this Complaint was filed) that Ms. Delcid may want to transfer units due to a dispute with neighbors, the Respondents have expressed that they would be more than willing to entertain and assist any such request made by Ms. Delcid (or on behalf of Ms. Delcid). The Respondents even pre-emptively held two units in August for Ms. Delcid

REB File Number: 2020-02605
HUD File Number: 03-20-6320-8
Page 9 of 13

based on the belief that she may request a transfer, but Ms. Delcid never made any such request and subsequently renewed her lease. Nevertheless, the Respondents continue to be willing to discuss any such requests with Ms. Delcid.

The Complainant bears the burden of proving the elements of discrimination by a preponderance of the evidence. However, the Complainant cannot show that any requests for reasonable accommodation were ever made, or that the requested transfer was in any way related to any disclosed (or even undisclosed) disability. Moreover, the Respondents continue to be willing to discuss any transfer requests made by Ms. Delcid, but she has chosen not to pursue this. As such, the Complainant cannot show that the Respondents refused to provide her with a reasonable accommodation and the Complaint fails as a matter of law.

### III.   CONCLUSION

Based on the foregoing, Respondents respectfully request a no-cause detem1ination and dismissal of the Complainant's Complaint. Please feel free to call or email with any questions. **(Tab II. C-2)**

### III.   PRIMA FACIE ELEMENTS:  Refusal to Make a Reasonable Accommodation:

a. Does the Complainant in any way meet the definition of a disabled person as defined in the Fair Housing Act, and therefore establish that the Complainant belongs to a class of persons whom the law protects from unlawful discrimination because of his or her disability?

b. Did the Complainant specifically request, either in writing or verbally, that the Respondent make one or more reasonable accommodations in the rules, policies, practices, procedures, or services? Were the requested accommodations necessary to afford the Complainant an equal opportunity to use and enjoy the premises?

c. Did the Respondent know or should the Respondent have known that the Complainant was a disabled person within the meaning of the Act?

d. Did the respondents deny the complainant's request for a reasonable accommodation?

**The investigation revealed the following:**

a. The investigation **established/ failed to establish** that the Complainant is a member of the protected class, disability. The investigation revealed that the complainant presented three different medical providers to provide verification of a disability associated with the complainant's request to transfer units due to her allergies to the dog smell and fur entering in her unit from the neighbors. The investigation revealed that the complainant's medical provider, Dr. Virani, Allergy and Asthma Center, advised that although the complainant is allergic to dogs, the complainant does not meet the criteria for disability and does not have a disability. The investigation revealed that the complainant's medical provider, Dr. Poss, Valley Pain Consultants, stated that he has only treated the complainant one time, she did not follow- up and he cannot complete the forms to verify her disability. The investigation revealed that Eric Fisher PAC, Winchester Orthopedics Ltd., advised that the complainant is disabled, is limited to walking with a recommendation of housing on the ground level. (Tab II. D-2 and D-5)  — good

b. The investigation **established** the Complainant specifically requested, verbally, that the Respondent make one or more reasonable accommodations in the rules, policies, practices, procedures, or services. The investigation revealed that the complainant and the respondents state that the complainant requested to transfer units due to being allergic to the pet hair and smell coming into her unit, on May 11, 2020. (Tab II. B-1 and C-3, C-4 and C-5)

c. The investigation **failed to establish** that the respondent should have known the complainant was disabled. The investigation revealed that the complainant stated that she was allergic to dogs and was seeing a doctor but she did not state she was disabled. (Tab II. B-3)

d. The investigation **established** that the respondent denied the complainant's request to transfer units. The investigation revealed that on May 11, 2020 Assistant Property Manager Finessa Lozano told the complainant that they were not transferring any units due to COVID-19. The investigation revealed on August 4, 2020, after the filing of the fair housing complaint, the Community Manager Marie White reached out to the complainant's housing worker offering a transfer to two possible units. (Tab II. C-2, C-3 and D-1)

IV. **PRIMA FACIE ELEMENTS: Refusal to Rent or Otherwise Make Housing Unavailable**

A. Does the Complainant belong to a class of persons whom the Act protects from unlawful discrimination?

B. Did the Complainant intend or attempt to offer to buy or rent, or to continue to occupy the dwelling consistent with the terms and conditions for buying, renting, or continued occupancy that were offered by the Respondent?

C. Was the Complainant qualified, ready, willing, and able to rent consistent with terms and conditions of Respondent at the time of the alleged act of discrimination?

D. Did the Respondents refuse to rent the property to the Complainant or otherwise make it unavailable?

E. Did the Respondents express a willingness to rent or otherwise make the property available to someone not in the Complainant's protected class?

**The investigation revealed the following:**

A. The investigation **established** that the Complainant is a member of a protected class, race, Black. **(Tabs II. A-1)**

B. The investigation **established** that the Complainant intended to rent from the Respondents. The investigation revealed that the complainant completed an application, paid all required fees and signed a lease on August 6, 2019. **(Tabs II. A-11, B-4 and C-2)**

C. The investigation **established** the Complainant was qualified, ready, willing, and able to rent consistent with terms and conditions of Respondent at the time of the alleged act of discrimination. The investigation revealed the Complainant applied for a unit, was approved and signed a lease on August 6, 2019. **(Tabs II. A-1 and C-8)**

D. The investigation **failed to establish** that the Respondents refused to rent to the Complainant. The investigation revealed that the Respondents and the Complainant entered into a lease agreement on August 6, 2019. The investigation revealed that the complainant states that she applied to rent unit 1181 #103 but when she went to sign the lease she was told the unit had been rented. The

investigation revealed that unit 1181 #103 was rented by E. Schmidt and K. Spurlin (white) with a new lease signed on July 2, 2019 to begin September 1, 2019. The investigation revealed that the complainant's housing specialist, Margie Himes received a Request for Tenancy Approval form on July 24, 2019 for unit 1171 #102 for the complainant. The investigation further revealed that on July 29, 2019 Housing Specialist Himes advised in an email to the respondents that this particular unit at $1324 was not within the programs voucher cost and the complainant's current unit (1811 #204) at $1312 was added to the request. **(Tab II. B-4)**

E. The investigation **established** the Respondents expressed a willingness to rent or otherwise make the property, 1181 #103, available to someone not in the Complainant's protected class. The investigation revealed that the unit 1181 #103 was rented to E. Schmidt and K. Spurlin (White) on August 25, 2017 which was prior to Ms. Delcid applying on July 26, 2020. **(Tab II. C-7 )**

**V.    CONCLUSION:**

Based on our **failure to establish** the *prima facie* elements, as analyzed in Sections III and IV above, the Real Estate Board concludes there is **no reasonable cause** to believe the Respondents discriminated against the Complainant by **refusing to rent or otherwise making housing unavailable** based on her **race** or by **refusing to make a reasonable accommodation** for her based on her **disability**.

REB File Number: 2020-02605
HUD File Number: 03-20-6320-8
Page 13 of 13